Good morning, this panel is the regular monthly motions panel and we have before us under the number 2007-1240 a motion for stay pending the resolution of the merits appeal, the injunctive order issued by the district court on the 12th of April. Just to be sure we all have the same understanding, I take it that we have before us the motion filed April 6th on behalf of Vonage, the response filed on April 13th on behalf of Verizon and the reply on behalf of Vonage filed on April 17th. I take it that's the complete set of moving papers of briefings, is that correct counsel? And in addition we have three sets of evidentiary materials, the first of which has exhibits numbered 1-9, another of which has exhibits numbered 1-14 and finally a volume with exhibits designated A-N, so three sets of exhibits. I take it then there are no others, so we're talking about the same six sets of printed materials I expect. Anybody dissent from that, speak now. All right, we'll hear first from the movement's attorney. Good morning, welcome, please proceed. Dr. Warren on behalf of Vonage. I'd like to begin by addressing two of the four factors that are outlined by this court in the standards for stay in standard papers. Before you begin, let me understand what's involved here. Is the key, the 7-11 and the 574 patent, is it true that the 880 patent isn't that important? It is not true. Verizon makes that representation on page 6 of their briefings, indicates that that is limited only to Wi-Fi materials. If the court looks at the specific injunction that Judge Strickland issued, it did not issue, he did not issue an injunction simply with respect to that one device. But in fact, he issued an injunction with respect to the use of devices in connection with the method patent. And he identified a number of specific devices which had, quote, infringing and non-infringing uses. And in the method patent, he seems to be enjoining the use of those. Those devices constitute a substantial portion of Vonage's business and not as represented in Verizon's brief, a modest or small amount. I find it very hard to tell from the briefs what's going on here. That's a real problem for us. Well, I think if the court simply looked at the injunction in order, which is attached to the materials, you can see specifically what Judge Hilton enjoined. It's just difficult to follow. I understand that, Your Honor, and hopefully at the time of Eric's time we'll have an opportunity with more pages and a greater record to illuminate those. For purposes that they say, for purposes of our moving papers, we tried to give a preview of what we believe are the issues on which we have a substantial likelihood of prevailing from the merits. So we tried to meet, given the limitations of both time and page limits, the requirements of standard data with respect to showing the likelihood of prevailing. We don't need to be lectured on the background law. Everybody knows that full well. What would be helpful is to get a better handle on what's really the core of the dispute here. I'm still not satisfied I understand your answer to Judge Dyke's question. I guess his question was whether it wasn't a terribly small portion of Bonnett's customers who would be affected by the injunction insofar as it relates to the 880 patent. And he said, no, it wouldn't be a small portion. Well, what sort of a portion would it be? The data I have indicates that it could be, if you talk about the devices that have both infringing and non-infringing uses which are identified in the court's injunction order, it could, in some instances, be more than 50% or 60%. Covered by the 880 patent? Well, covered by the injunction. Judge Chilton gave a specific injunction and identified products in that injunction and said not only those products but similar products. And with respect to a method patent, he enjoined the use of those products, many of which have both non-infringing uses which means What products are being enjoined? As I understand it, the 880 patent relates to cordless telephones. Do I understand that? That's correct. All right. So what is he enjoined that's a problem beyond cordless telephones? Well, let me give you an example. You can have a telephone like all of us were using since the 80s where you have a cordless telephone pre the injunction that sits in your home. And you can have a corded function where you can simply pick it up. But it also has another handset that allows you to go to the kitchen or something else. Now, a reading of Judge Chilton's court with respect to that type of device, which has both a corded and a wireless function, and so therefore could be operated in a non-infringing manner by a user, seems to be enjoined by his order. Well, that can't be right. It can't be that something that's not covered by the asserted and adjudicated patents is covered by the injunction. But why is it argued contrary to what they've stated in the brief if you look at the expert reports? I don't care what they argue. The judge can't possibly have ordered that people stop using things that don't infringe under the judgment entered. If you look at the judgment, and particularly page four of the injunction, and he says, this is talking about the 80s, Which tab is this? Hold on. It's tab one to the Verizon attendance. Oh, thank you. And specifically, if you look at page four, in the spring of the 80s, the response to Judge Knight's question, regarding claims one, six, seven, and eight, the independent claim and the three dependent claims, the Vonage enjoined parties are further specifically restricted and enjoined from infringing by using devices having wireless capabilities to complete call to and from Vonage customers over the Vonage network, including these devices. So it's not limited to those devices. If you look at the last device, the UT Starcom F1000 wireless telephone, that is a Wi-Fi phone. That's the only, quote, Wi-Fi phone listed there. And the evidence put on by Verizon and its experts sought an injunction with respect to these other devices because they can be used by the customer in a cordless operation. And so we believe that if the injunction is to be literally read, we've got to be prudent in the way we read it. It seems to enjoin the use of these devices, which in fact is by the consumers, even though at trial, I still don't understand what you're trying to say. Are you saying that non-infringing uses of certain devices are enjoined in this order, yes or no? Yes, it appears to be that way. Well, how can that be when sub-A in the portion of paragraph number three on page four that we're talking about, the first word is infringing, enjoined from infringing by using certain listed devices. If they're not infringing, the use of those devices would not be covered by the terms of this order. Vonage never uses them. You're correct that in those situations, if it's being used, it's being used by a consumer. Well, of course. And so the risk of being in a show-cause order or contempt, and it is clear, it is clear that the distinction the court made applies equally with respect to all of these devices. I'm just trying to understand whether we're talking about one percent of the customer base or the majority of the customers. You started out suggesting that we're talking about a majority of the customers because of the way the injunctive order was drafted. When I look at the injunctive order, I'm now doubting that it is a majority. I think I'm back to one percent. And I'd sure like to get some sort of clarity and some perhaps agreement of the parties so that we can proceed on a basis that's rational and not paranoid. We'd be happy to do that. And the situation we find ourselves in is Vonage sells all of these devices. But are they all used wirelessly? Are they all Wi-Fis? They're not all Wi-Fis. The only one that is Wi-Fi is the Starcom F1000. Starcom 1000. That's the only Wi-Fi system that you would have. Right. That's the only Wi-Fi system. But the others can all operate wirelessly. And they go in through devices. In the same manner as you would be required under the 880 PAC? Under the same method? Well, that we believe is the way that the court has construed the claim and the jury found it. We believe that that was the evidence that was presented. That all of the other systems, even though they're not Wi-Fis, they can be used as Wi-Fis. And then if they're used as Wi-Fis, then they would be infringing the claims of the 880. Don't answer until the question is over. This is a persistent problem. We're going to have to stop that immediately. Judge Gallagher. Does that mean that everything that's done under the method of the 880 patent for those particular items, even though they're not Wi-Fi used, would infringe the 880 patent? We believe that when Vonage signs up a new customer, we're talking about being trying a new customer, and they ask for one of these devices. These devices. You provide the device. We do. We don't provide any network in that sense. We use Verizon's DSL network or a cable company's network, and we simply plug our device into the other broadband connection that somebody else provides. And so that device, which we provide, gets plugged into a cable network or Verizon's DSL broadband network, and then the consumer starts to use it. So what you're saying is that the injunction, since under the district court's view, pending appeal it only covers signing up new customers, prevents you from providing these devices to new customers. That's the problem. Very well said. And when we provide them to a new customer, that device may be used in a wireless format because it's got a corded receiver, and it has a receiver like your old cordless phone that you can walk around. And so since it can be operated in either way, and since we now have an injunction, it's now stating I'm infringing with respect to new customers. If a new customer calls up and says, I want to sign up for Vonage, and I want this particular device, we are at risk that that device could be used by that customer in an infringing mode. How many new customers? What percentage of new customers request one of these devices? I have some data. That was the data I was trying to give the court earlier. It is very common that new customers will ask for a device that can be used in a cordless fashion. Okay, but what percent? I'm talking about 1%, 25%? 1% is just true Wi-Fi. We've got a series of devices here. He said you can't provide to new customers. What percentage of the new customers request these devices? I have statistics, and they range from 14.8% for the Linksys RT31P to another one is the Motorola VT2142. I can go down the list. I've got a list of 15 or 20 devices. They all add up to 100%. But if you included those that can be used in the manner I described, in a wireless function, my calculation would have been 2.50% of their customers ask for, when they sign up, devices that may be used in a wireless mode. So you'd be inducing infringement by providing the device? Well, that would be the argument, although contributory and inducing infringement were expressly thrown out by the trial court. And so because the trial court was concerned at a point in the trial about customers like himself using a phone and being the last infringer. But the difficulty we have now, going forward, when we have an injunction and it's not stated with respect to new customers, we were told we should not sign up new customers that will use these potentially infringing devices. And that's the dilemma we find ourselves in. We have no way of knowing when the phone is being operated, whether it's being operated in a wireless fashion, where they took the phone off the book and walked it to the kitchen. That would seem to be an ironclad defense against the charge of inducing infringement. So I don't understand what the problem is. If the customer could use it to practice a method, but you're not encouraging them to do so or telling them to do so, I don't see how you have any risk or liability on the theory of inducing infringement of a method pattern. We would be delighted with respect to the outcome of this if the court said that we think the only fair reading of this injunction is the Starcom device, which is what Verizon says it is pleased. And so if we were permitted during the pendency of the appeal to continue to take new customers with these other devices, which can be used in a non-infringing manner and another infringing manner, then that addresses the issue that we started on, which is other agents. You're also asking us, though, to stay the injunction for the Starcom F1000, right? We are because it's part of the same system. So it's not just the other items. It's also including the UT Starcom. Yes, but I will acknowledge that the percentage that Judge Dyke referred to of 1% or less is the percentage for that particular type of Wi-Fi device because it's not one that people usually operate in their home. It was attempting to be an analog to a cell phone that you could take to different locations. So if I understand correctly, what you say this injunction prevents you from doing is providing service to people that have this class of devices, right? New customers. New customers. So the new customers request this kind of device. Actually supplying the device is not an infringement, though it might be an inducement, but it's providing the service to the new customer who has this particular device. That's right. And the only way you can control that is not to provide the device to the new customer in the first place. That's true. Right? That's true. What's the difference between you and Verizon as to how to construe the 880 patent with respect to this local area issue? There was a charge conference, presumably, right? A jury charge conference. There was. And your contention with respect to all these claim terms, I assume, is that the charge was wrong, right? That's correct. Okay. What charge did you suggest with respect to this local area issue? The judge had made the determination in the Markman hearing and simply instructed the jury consistent with the Markman hearing on us. We requested, to answer your specific question, that the term in the claim, localized wireless gateway system, be defined to mean localized wireless gateway system means a plurality of base station receivers within a range of a few feet. Okay. Now, how would that help you? The way that would help us is the devices we just talked about have ranges substantially beyond a few feet and, therefore, would be non-infringing. And we came to that interpretation because this particular patent was rejected six times by the patent office. And only at the time of the sixth rejection and amendment did Verizon then come in to distinguish itself from two pieces of prior art and limit their claim to a few feet. Those words were their words in a prosecution disclaimer. To distinguish themselves from certain patents having to do with cellular and Internet and to distinguish themselves, on the other hand, from a local phone system that didn't operate on the Internet. Why did they need to do the latter? I thought they were only trying to distinguish their application from the patents in the former category. The patent office had rejected their claim and cited numerous pieces of prior art. One of the pieces of prior art that the patent office cited was a device that operated wirelessly and operated within a few feet. But, in its disclaimer, Verizon said that that device doesn't connect with the Internet. So we're distinguishing ourselves from that. Yes, we are like it in the sense that we operate within a few feet, but we are different from it in the sense that we are Internet or VoIP oriented and it isn't. Then on the other side, the patent examiner had identified certain patents, the Ferris and other patents, which talked about a wireless system that operated on VoIP. And to distinguish themselves from that, they said, well, and they termed them, excuse me, cell phones, excuse me. And to distinguish themselves from that, they said, yes, but those operate more than a few feet. And to distinguish themselves from that, they said, Verizon operates within a few feet. So they're threading the needle after six rejections to get... What is the range of the Ferris and those other cited patents? I went back and reviewed and I didn't find any specific reference with respect to number of feet or meters of each vessel. It's not in miles? No, I don't believe it is in miles, but I don't think there was any description with respect to how far it was in those particular patents. And I've read the patent and prosecution history of those. And for example, one of the things that the inventor could have done to distinguish themselves is they could have gone back to the specifications. And the specifications have certain identifications such as a mall or an airport. And they could have used the same language that they used in the specifications to try to distinguish themselves from the Ferris and other patents that the patent examiner had rejected their claim on. So you agree that the specification didn't limit it to a few feet? Yes, I agree. But what happened is rather than going to the specification and saying to the examiner, look, the specification makes it clear that this would operate in malls and airports, rather than doing it, which was language that was in the specification from the beginning. They said, no, no. They didn't argue that argument. They said, ours operates within a few feet. So under the doctrine which this court has regularly recognized, the prosecution's disclaimer, they had broader terms. Those were rejected by the patent. I'm not understanding. The devices that you're supplying to the customers that are said to involve infringement of the 880 patent do operate within a few feet, right? They just also operate beyond that. That's correct. So why aren't they infringing if they're used within a few feet? Because the patent is limited to and claims with respect to, as consistent with the prosecution's disclaimer, with respect to devices that only operate within a few feet. Because a cell phone, which they're trying to distinguish themselves from, operates within a few feet. You could be right next to the cell phone transmitter. It operates within a few feet. But it also operates a much further distance away. So to distinguish themselves from that prior art, they limited themselves to a device that only operated within a few feet, not also operated within a few feet. Now, where's that language, the disclaimer? It's in our materials, but I can cite it to you as well. If you look at our initial brief, Your Honor, and it's what I have labeled tab E, and it's the earlier patent that's specifically on this. This is also referenced in our paper. It's specifically referenced on page 5 in the last paragraph of this particular amendment that was filed on September 26, 2000. Where are you in the materials? It's the first brief, and it's the fifth tab. If you go back in that, which is the portion of the prosecution history. And near the end of that, you will see a document that is amendment after final rejection, received October 11, 2002. That's the same one that you cite in your motion for staying. That's exactly right. Page 8. That's exactly right. And if you look at that document, where after six rejections, Verizon is distinguishing the Pinner's prior art and the Ferris prior art. You see their efforts to distinguish that on page 3, the first paragraph, and then you see their efforts to distinguish that on page 5, the last paragraph. This court has regularly recognized that if a patent holder chooses to limit its device and tells the public it's going to limit its invention beyond the claim terms, it is stuck with the limitation that occurred in order to get the patent. There's no dispute between Vonage and Verizon that they made this disclaimer, and the patent office, which had rejected the patent six times before, then issued the patent. There's no... You don't need to keep repeating that it was rejected six times. It's immaterial. It was allowed eventually. It's allowed. It's been litigated. Whether it was rejected zero times or a hundred times makes no difference at all. You're correct, Your Honor. My only point was that it was only approved after this particular disclaimer. And you're right. It could have taken place the first time or the sixth time. It's irrelevant. But prior to this disclaimer, the patent had not been issued. Well, what does a few feet mean? Two feet? Twenty feet? A hundred feet? Well, we don't think there's an obligation, I think this court has said, for the court to construe constructions. All we ask is that the jury be instructed using the ordinary, uncustomary language that the patent holder did, a few feet. And it could be the subject of evidence and testimony at trial. Let the jury make that determination, as they do with other things. Our complaint is the failure to instruct the jury with the language that Verizon itself used to limit its claim in the prosecution history. I thought the point being made here before the use of the famous words few feet was to define localized system and distinguish localized systems from what I'll call non-localized systems. The use of a few feet is to distinguish it from a wireless system that is not localized. The court is correct. And so they talk about a localized wireless system, which is defined as a few feet, in the sense of a cordless phone that is restricted to operate within a few feet from the base station. What do you make of the phrase in the sense of a cordless phone? Is that to be read as if it had said, for example, in a cordless phone? I don't think so. Well, how should it be read? I think it should be read as a disclaimer, meaning that— No, no, but the phrase in the sense of. That means this patent is now being interpreted in the sense of. Maybe the phrase localized wireless gateway is being interpreted in the sense of, i.e., with the meaning of, within a few feet. I think that's a fair and ordinary interpretation of this when you see what the line is that they're trying to walk between. I would interpret that, Your Honor, as with the meaning of, in the sense of. But the few feet that they could be talking about would be the range within the specification that they've disclosed. Well, I don't think so. Within a mall or within a warehouse or whatever. I don't think so for the following reason, Your Honor. If that was already in the specification, and in this amendment, if they simply wanted to remind the examiner of something that was already in the specification, they could have said, we're different from those other devices, those cellular and other devices, because we only operate, our meaning of localized wireless gateway is within the mall or in a warehouse. That was already in the specifications, and the examiner had not granted the patent. It was only when they used the phrase, within a few feet, that the patent was issued. As I acknowledged in response to earlier questions, that specification was originally brought up. But that is always true in the case of prosecution disclaimer. That you always have a claim that, as read in its ordinary meaning, would have a broader interpretation, a potentially broader interpretation, particularly if you read it as informed by or in conjunction with the specification. But in every prosecution disclaimer case, what has happened is this court has said that if an inventor, in order to get the patent, tells the patent office certain things and tells the public, because there's a public, certain things in order to get the patent issued, it is stuck with its disclaimer. It is stuck with its admitted narrowing of the claim. And we think a fair reading of what happened in this particular amendment is that that's what they did. If it was simply to repeat what was already in the specification, they could have said to the examiner, We're different from Ferris and these other three prior references that are cited here, because they operate beyond the scope of a mall or an airport. They operate in a wider area. Our definition of local only goes to things like a mall or an airport, and they're broader. That was already in the spec. They didn't do that. What about the voice compression issue? What's the significance of that as a practical matter? Let's start off with what did you ask for in terms of an instruction? I don't think there is currently a dispute with respect to compression and decompression at this stage. But the devices, when we listed in our brief those items with respect to the 880, that we believe that there was an improper claim construction by the trial court, we identified local wireless gateway systems, and we identified public packet data communications. But I thought there was an issue about the function that the localized wireless gateway system had to perform. And there was a question as to whether the gateway system had to perform voice compression. Yes, that's correct. So what did you ask for? What we asked for is that a localized wireless gateway system means a plurality of base station transceivers with a limited range within a few feet and a packet service gateway that compresses and decompresses and packetizes voice signals. And he left out, he did not include the latter in the charge to the jury. That's correct. The charge to the jury is as follows. The term localized wireless gateway system means a system which is fixed to a limited or local area, which provides wireless service within that area. And did Verizon argue that the gateway didn't need to perform the function of voice compression? Yes. And you rely on language and specification describing the present invention as doing that. That's correct. So there are, within that disputed terms, the court construed the way I just read, we have the leaving out of a few feet from the prosecution's disclaimer picture, and then also leaving out the fact that the gateway between that device and the internet compresses and decompresses voice signals. And as I said a moment ago, so with respect to the 880, there are two issues of claim construction we objected to. One is this definition of localized wireless gateway system. And on that, the court's simple definition was that it means a system which is fixed to a limited or local area. The problem we have is local area could be Arlington, Virginia, or the District of Columbia. And it didn't provide sufficient guidance to the jury, and was inconsistent with what Verizon itself argued in prosecution. The second argument, or with respect to the definition of public packet data communication network, is that the ordinary and customary meaning of what an ordinary skill in the art would not limit that definition simply to a packet switch network. And if you go through the 880... I don't find that argument very convincing, the latter argument. I don't understand the basis for your suggestion that it would cover a switch network. Well, the reason is a reading of the packet. And the way we did it is you look at the claim, and if you look at the claim for the 880, the first claim which has the phrase public packet data communication network, which is the independent claim, uses that term. And if you look at the dependent claims, 6, 7, and 8, they specifically identify the Internet, or they specifically identify the packet switch network. This court, under the doctrine of claim differentiation, has regularly said that a dependent claim... But where is there any reference in the specification to this patent covering a circuit switch network? Well, there are numerous references, and I can give the court some of them. Give me one that will suggest that it covers that. All right. Column 6, line 55 to 59. And this is in the preferred embodiment, and they talk about such as, suggesting that it's not limited to a packet switch network. Well, where is there any references covering a circuit switch network? There is not a statement of the sort that Judge Steiff has asked me directly about. What we're saying is that throughout the patent, in the specifications and in the dependent claims, the inventors knew the phrase packet switch network. They used it repeatedly. And so by using it in the specifications and in the dependent claims with that word, they chose to use different words in claim number 1, which is the independent claim. And so there is a presumption that when they know both words, both sets of words, and they choose in the dependent claims and in the specifications and in the best mode to describe in using words such as a packet switch network, they have not limited it to. They have not said, for example, the present invention is limited to a packet switch network. What they've said is that the claim is for a public packet data network. And then elsewhere, they use a more precise term. So we suggest that anyone of ordinary skill in the art in 1997 reading have to say when they wanted to use a more precise term in a preferred embodiment or dependent claims, they knew how to use that language. But in the broadest claim, the independent claim, they didn't use that language. They used a term which can't include networks other than packet switch networks. And there are some examples throughout the patent. And so with respect to the AE, those are the two arguments we make that the claim construction given to the jury was irrelevant with respect to the localized wireless gateway system instruction with respect to the public packet communications network, communication network data. If the court would permit, I'd be happy to talk about the other two patents, which are also in dispute. And again, our arguments with respect to those have to do in two instances. Mr. Warren, with respect to that, before we run out of time, did you raise the issue, did you ask the court to define destination address during the markment procedure? Yes, we did. And I would give you that definition now, Judge Garza. You did ask for it. Yes, we did. In the markment hearing and from our brief and at the argument, the definition we asked for is as follows. Destination address means an identifier of an endpoint in the public packet data network. The simple way to understand this is the metric. If I am getting on a DuPont circle, someone asks me where I'm going, what's your destination address? And I say Union Station. I don't say Ferguson Road, gallery place. Yeah, but what is the significance of this in the context of this dispute? The significance of this is it's the destination address that needs to send back certain data. And in the evidence in the record, there is an intermediate point, namely the RTP relay that sends back the data with respect to many of the bond operations. So, by allowing a definition that permits an intermediate point to be viewed as the destination address, there are certain devices that would infringe under that definition because it's an intermediate device that is handling things as opposed to the gateway to the PSTN. And so, we believe that the one ordinary skill in the art, that the ordinary and customary meaning of destination address is not going to be given by the court. No one, if you even look at what Verizon did... Is that the final address or is that the intermediate address that they're talking about? Let's assume for the moment that we go back to the old mailing system, where I send a letter to you to a P.O. box number, and it goes to the post office, let's say in Washington, D.C., and you have a P.O. box there. It's in your name, and the letter sits there because you don't get it until you open up that box and you pick it up. Correct. Is the destination the post office or is the destination the P.O. box with your name on it? It's the P.O. box with my name on it in that situation. That's the destination address. Is the intermediate step then the post office itself, the building where the box is in, is that the intermediate step? I wouldn't think so. Let me give you a mail example. Let's suppose that mail is delivered to my house, and I have a mail box outside or by the curb, and I have to go get it. The address where the letter is delivered, the last point where it's delivered before I have to go get something is the destination address. In this situation on the Internet, the last place on the public packet data network where the voice communications or the responses back and forth are delivered is the gateway. By permitting a definition that entertained the ability to have intermediate destinations as the final destination or the destination address, there's a whole group of activities that Biden would say are non-infringing because the activities that in the patent have to take place at the destination address aren't taking place at a destination address. How do we know all this? You say this. Was there testimony to this effect at the Markman hearing? There was no testimony at the Markman hearing. Well, how do we know that what you're saying is accurate? At the trial record. The trial record? At the trial record, there was testimony of that sort by the experts and by the technical people at Von to describe how their system worked. And the Markman hearing was held on a Friday, Wednesday with no evidence, and so the trial court relied on the briefs and oral arguments. We made many of these arguments to the trial court, but the trial court adopted claim constructions that Verizon proposed. Did you propose expert testimony on the claim construction issues? The judge made it clear that, at least in his court, he doesn't operate that way. In fact, we were told it was unusual that he had a Markman hearing. In fact, we just did our motions there on a Friday. So the answer is, we were told what the judge wanted, and we tried to comply. Did you request a specific jury instruction on the destination address? We did at the time of our Markman hearing, basically what we wanted. But not at the charge? At the charge, we objected with respect to the charge. We knew our objection with respect to what was asserted on Markman, and the gist of our instruction that we proffered at the time of the Markman hearing, namely that a destination address means an identifier of an endpoint in the public data network. And we believe that if that instruction had been given, we would have been happier. What about translation? What instruction did you request on that? The instruction that we asked with respect to translation was that translating or a higher level protocol identifier of a node to a different lower protocol. What if you're wrong about the higher to lower? What if we were to hypothetically agree that it has to translate from one protocol to another, but it doesn't have to translate from a higher to a lower level? That would have still been dispositive with respect to a number of the infringement claims at trial. Yeah, but have you preserved that? That's the question. If you, under Biodex and other cases, if you ask for an instruction and you ask for the wrong instruction, even though the instruction that was given was itself wrong, you may not have preserved the issue. Well, we would be happy to address that before the merits panel. We believe that that issue was preserved. But more importantly, we believe the instruction we proffered was correct. And we are prepared to go through both the claim terms and compare them with specific references and specifications to show that every environment that was given, including the environments that Verizon has argued in its brief to this court. What does higher to lower mean? Higher means domain name to internet address? Yes, that's an example. What are other examples of higher to lower? Well, I'll have to defer to some of my colleagues, and I may be able to dwell on it, too. Telephone number. You know, telephone number to an IP address. So a broader definition, less specific, to be more specific in detail, would be an example. In both examples that we've talked about, that would be higher to lower. And if the court goes through the specification, the court will see that every environment, from our reading of it, involves a change of protocol from a higher to a lower. Including the examples quoted from the claims expert in their brief, and including the example given in their brief about how they're transferring from a domain name to an IP address. We believe that the examples they give in their brief are examples of higher to lower. And so if that instruction had been correctly given to the jury, it would have been consistent with the specification, and it's consistent with the examples that Verizon itself gave to the trial court in the hearing. But the judge did not give any instruction with respect to translation and transfer. None. We had asked around, and the judge gave no definition. And it became critical because the jury, after being out less than an hour, came back and asked a question. And the jury asked, are there any court definitions relating to translation or name translation? Now, there is a suggestion in Verizon's brief that Mr. Waring, you're going to have to draw it to a conclusion. We've given you a full 30 minutes over your 15 minutes. We're not going to retry the case here this morning. So wrap it up, and then we'll hear from the other side. I'll try to finish my last sentence. That Verizon suggests that the jury was instructed on the meaning of the term translation. That is inaccurate. The court looks at the jury instructions, which are here. The only thing that the jury got when they asked for the question that I just read to you is, are there any court definitions relating to translation or name translation? The court repeated its definition of name translation request, which was a query, but never illuminated or construed for the jury the question that they had, which was, what is translation of translation? And so we asked for a thing instruction then. One wasn't given. The jury specifically asked a question with respect to that. And in response to that, a judge simply repeated the definition of name translation request, which was a query rather than defining the word translation. Thank you. Mr. Taranto. Thank you, Your Honor. If I could, I would like to begin by framing the inquiry in the following way. Standard Haven says that on the facts there, that was a close question whether to grant a statement. Let me indicate the three basic aspects of Standard Haven and basically frame this argument by saying, if that was a close case, then Vonage hasn't met its burden here. First, Standard Havens involved a money judgment and an injunction that were entirely unstated. Second, Standard Havens involved an applicant that put in an affidavit that specifically attested that insolvency was likely. Nothing like that here, only a whole series of hedged and qualified statements about possibilities and no answer to our specific and simple quantified showing that the partial stay in which they would save $300 to $400 million in advertising costs keeps them, in fact, puts them in the black during the appeal. Does your starting out that way suggest that you agree that they've raised substantial issues on the claim construction? No, that, of course, is my third argument. Standard Havens involved an unusual merits position where the PTO examiner had, on the crucial validity question, issued a reexamination saying that the examiner had misunderstood a piece of prior art as not involving a claim element when, in fact, it did. So now let me talk about the merits. And if I can divide them into the two pieces, 711 and 574, and the 880. First thing I want to say about 711 and 574 is this. Of the three issues, one involves only the 711. Destination address doesn't involve the 574. In the court below, Vonage proposed a construction of destination address, which is a term only of the 711, not of the 574. That term is therefore not an issue in the 574. But translation is an issue. Translation covers both. And the specification, the written description in the 711 and the 574 is identical. Is that right? Yes, exactly. That's right. 574, they share a specification. So where in the specification does it suggest that translation does not involve a translation from one protocol to another? And where does it suggest that formatting would be the same as translation? First of all, if I can say this, I think that Your Honor's suggestion, I would say, is exactly right. They have waived their current claim construction position on translation. Their current trans- But you didn't argue that in the opposition, right? No, we didn't. But the fact is we prepared it so quickly we didn't notice the point that they had, in fact, not made any argument whatsoever in their merits piece of this stay application for a higher to lower level position. And that is the only claim construction position that they proposed below that. Are you saying they waived it for the stay or they waived it in the merits? Waived it on merits and, therefore, for the stay. They are now asking for a different claim construction, different in scope, from the only one that they proposed to the trial court. And they can't do that under Interactive Gift Express and numerous other cases. Let's suppose for the moment that they didn't waive it and that they raised one protocol to another issue. They say the translation covers that and doesn't cover mere reformatting. What's the answer to whether or not that's not a correct construction of this patent? In other words, that there has to be a change from protocol to protocol. I think the answer would be that would, in fact, add nothing to the instruction that was given. Translation takes its ordinary meaning. So you agree that the patent requires change from one protocol to another? I don't know what changing a protocol is. Well, it would be, for example, it would be changing a domain name to an Internet address or a telephone number to an Internet address, right? I don't know that telephone numbers constitute a protocol. I understand that in certain standards worlds, in the Internet world, there are different layers of protocols called layers that have the word protocol attached to them. The telephone number is not part of the Internet world. I think it would just be confusing to introduce this concept of protocol as a substitute for the ordinary meaning convert from something to something else. But why does translation encompass reformatting? That's the problem. Because there are two different readers, right? But it doesn't involve resort to a database or look-up table, right? It depends on what's doing the reading. Dr. Henry Ho, our expert, explained in response to Mr. Warren's question. We're not talking here about human beings who can look at a whole sequence of characters and say, oh, I can pick out in a very easy way what's in there. What we're talking about is going from a machine, the inbound proxy or the outbound proxy, that reads a particular kind of thing, sit inbound, and it reads that, and it doesn't read telephone numbers. And it takes that and it sends it off to something else, and the something else doesn't read sit inbound. It reads strings of characters that may sit inside sit inbound. Different readers that understand different languages or protocols or formats, I think all of these terms are essentially interchangeable in a perfectly ordinary sense. If you go from one to the other... You're getting a little technical for me. You need to help me here, okay? My understanding is that under the Vonage system, it receives something which includes a telephone number, but the telephone number may have one before it. It may use parens or not parens. There are different ways of presenting the telephone number, and the software helps you to isolate the telephone number in a way that it can be read. It reformats it. Am I understanding correctly? I think that's one reasonable description, but it's very important, as Dr. Henrivo testified at the trial, that when you're talking about a computer, it's skipping a tremendous amount of real-world technical work. Yeah, it's a complicated process. It's hard for the computer to do that, but does the computer, when it does that reformatting, have to use a look-up table? There are look-up tables along the way. Yeah, but does it use a look-up table? In some of the environments, yes, it uses a look-up table. For that purpose? For the reformatting purpose? No, it doesn't use it for the reformatting. A look-up table, after extracting a phone number from this long SIP invite, picks up that phone number, takes that phone number, and then inputs it into a table that wouldn't recognize a SIP invite but does recognize a phone number, just as the original extracting machine wouldn't recognize a phone number but does recognize a SIP invite, and then the look-up table takes that input of a telephone number and produces something. Sure, sure, but does the bondage system use look-up tables? It does. Is there testimony to that effect? Yes. But we don't know that because nobody's provided to us in the briefing, right? No. What we have here is an attempt to say that translation was incorrectly defined. Why? Because the court didn't adopt the only claim construction proposed to it, which involves higher to lower level protocol conversion, a proposition that bondage did not even defend in here because it understands that you can't accommodate that. But suppose the instruction, suppose the requested instruction had been translation requires the use of look-up tables, right? And would that have been a correct instruction? No, I think that would not have been because that would have been too narrow. That's not the only way you can do a converting of one thing to another. Okay, if that had, however, assuming that was the correct instruction, that the translation requires the use of look-up tables, was there an argument that the bondage system did not infringe because it didn't use look-up tables? I'm told no because I don't think things were framed in that way. I think I'm probably having a little bit of trouble understanding the specifics. The bondage system, when its customer picks up its phone and routes it through the broadband connection, goes first to one device, which gets a SIP invite, and that device does a certain thing. Sometimes what it does is take out a phone number and send it to a domain name server or some other kind of look-up table and send out other information. Sometimes it does certain other things. So there are several different translations that occur at different places. The 711, for example, does not involve translation to a telephone number. That's translation of this main request, the SIP invite, into a destination address. The 574 involves translation of the main request, the translation request, into a telephone number. Those are two different things in the bondage system and different things in the pattern. But is the bondage system translating telephone numbers into Internet addresses or domain names into Internet addresses? It's not doing those things, is it? I think it actually is doing those things, but I may have not quite followed that. I'm not sure those are the things that are called for by the patent. But it's the two different patents, right? The 574 requires translation of a main translation request. It has a main translation request, so translating a name into a telephone number, not translating a telephone number into something else. It's the other direction. The 711 requires translating a name into a certain destination address. But that's only in the claims because the specifications are equivalent. Is that correct? The specification disclosures are the same, so they're not separate and distinct in that regard. It's only the claims that are separate and distinct. Yes, they go for different translations. But if the specification, I think, makes anything clear, it is that it is intended to cover a very wide range of anything that constitutes a name and translate into any number of different things that can be the endpoints of translation. You're saying it includes reformatting. The term reformatting is not used in the specification, I don't think. Well, you have this piece of testimony that's become so prominent in the briefing here where this witness is asked a question about, you know, if I recall it says it provides the first name and it gives the second name as well. I would call that reformatting. And as I understand it, Verizon's argument was that that limited kind of process, which doesn't involve translation between domain name and Internet address or telephone number and Internet address, in and of itself was an infringement. Right. No, because that's not what goes on in the system. So the question whether if somebody spoke the two words in human English language, Henry Ho, and said, now I'm going to use Henry, is irrelevant to the question of infringement. Vonage uses machines. Those machines receive things called SIP invites. SIP invites contain a name that needs to be translated, and the name can be 301-652-1234 at Verizon.com. That can be the name. The patent specifically calls out or discloses telephone number-based names. It's translated into what? Into any number of different things. The 711 asks for translation into IP addresses. The 574 claimant issue asks for translation into a telephone number. The specification specifically talks about translating into a telephone number. Column 9, lines 10 through 12. Column 10, lines 10 through 11. But I understand that, but what it doesn't talk about is taking the information unscrambling so that a telephone number written with parentheses or with a 1 in front of it is the basic telephone number is extracted from that. And your witness said that can be a very complicated process to do that. But as I understand Vonage's argument, they're saying that their system does only that, and that that kind of reformatting is an infringement of the patent and that the jury may have reached a conclusion of infringement because of the breadth of the translation interpretation. But what the specification specifically talks about is that the name, which is going to be translated, can be 301-652-1234 at Verizon.com. And it specifically talks about translating any number of these names, including that one, into a telephone number, 301-652-1234. The specification talks about that. The specification is, by its terms, designed to say any number of things can be a name. But I don't see in the specification where it talks about translating one format of telephone number into another format of telephone number. It doesn't use the language of format, but it specifically says the names that can be translated can be telephone number names. A telephone number can be translated into an Internet address. What I'm not seeing is where it talks about taking a telephone number in one format and translating it into another format. That is eliminating the parens, eliminating the one, scrubbing it, so that it's understandable. And that's because the specification, the invention, is about anything you can conceive of as a name and translating it into any of the number of things that you need at the back end, the IP address or the telephone number. It doesn't say, we can imagine now 15 different kinds of names and 14 different kinds of things we need to translate into, and now we're going to do whatever the thousands or something of combinations and identify number one can go to number one, number one can go to number two, number one can go to number three. It doesn't have to do that because it's saying anything that can be remembered by the caller can be a name, including the phone number at Verizon.com, and what you need to convert it into. Translating is just converting it into something else, and that can include not only the IP address, but the telephone number. So what it describes in its deliberate way encompasses this very thing. But where does it say that? I'm not sure what the fact is. Where does it say that what I've called reformatting is covered by this patent? I've read the patent a couple of times. I'm having trouble finding where the written description characterizes that as translation. The best that I can do is to give you the citations for the many places it says the name can be telephone number. Well, what's your best example? Column 8, lines 54 to 59. Column 9, line 18. It repeatedly says the name can be telephone number at Verizon.com, and then it repeatedly says at column 9, line 10 through 12, column 10, line 10 through 11, that you translate and translate into a telephone number. But it doesn't talk about scrubbing the telephone number so it's readable. It talks about translating the telephone number into an Internet address. Maybe it talks about translating the telephone number into a domain name, but it doesn't specifically talk about scrubbing the telephone number to make it more easily readable, does it? The language of scrubbing or reformatting or extracting is not there, and that's because the concept is broader than that. Anything that's a name can be converted into IP addresses or telephone numbers. Anything that includes a name or anything that says it's a name can include explicitly the telephone number base. Yeah, but what you're saying is it can convert a telephone number into a telephone number. No, that's wrong. Converting a string of characters that a computer that only recognizes telephone numbers wouldn't recognize because it doesn't speak telephone number language. It speaks SIPIN-type language, which includes the telephone number as one part of a whole long string of characters. So it does, in fact, add more information to take one set of characters that a new reading device, the one that needs to read the second thing at the back end of the translation, wouldn't recognize and convert it into something that it does recognize. For a human being told Henry Ho into Henry, that seems like a simple process. These are not human beings that are sitting inside the bondage network or that are contemplated in this network. It could be O. Henry instead of Henry Ho, right? I'm sure there are many variations. You skipped right over the destination address saying it only applies to 7-Eleven. Yes. What should it be defined as? What is the definition of the destination address other than the one that was submitted by Vonage? I think the destination carries its ordinary meaning, a designated stop, not just a stop that occurs by operation of the transmission system. Any stop along the way or the designation stop? Let's say I'm taking the Metroliner from Washington to New York and there are stops along the way. I'm going to New York City. What is the destination address for me when I'm on that train? I think it depends. If you decided, I'm actually going to stop and see my aunt in Baltimore and I'm going to stop and maybe sit on the platform and I'm going to stop and stop in Newark or something. I don't know why, but some people do. But with respect to the destination address, wouldn't it be New York City? Just like when I'm making a cross-country trip and I stop at various places along the way to visit people or to do any number of things that I want to stop off and do, they're all going to be destinations on my itinerary. And that's just an ordinary meaning. There wasn't any other contrary proposed definition except the one that Barnes now defends, which is a final endpoint on the packet network. Well, did they request a definition during the Markman hearing? Yes, they did. It was rejected by the court. It was, and it was rejected by the court where the court said it doesn't have to be this final endpoint on the packet network. On what basis was that done? If it was not the final endpoint of the destination address? If I'm trying to dial in on the Vonage system and I'm calling 301-1234, shouldn't that be the final destination number that I'm trying to reach? It depends what destination address is used in a number of different ways in the patent, some of which is not something that you, the individual, are designating but something that a machine is designating. But even if that were the example, that would not meet Vonage's definition because you just identified not an endpoint on the packet switch network at all, but rather the endpoint, the human being at the other end of the call. And that's actually plain on the face of Claim 20, the claimant issue in 711. The second clause says that the second destination address includes not only the IP address but further includes information relating to Paul Rowdy via public switch telephone network. It says in the claim itself the destination address is not limited to something on the packet network. It's what you get to by going beyond the packet network to the PST and the public switch telephone network. What is the first destination address in that Claim 20, then? There could be several, but it might be the IP address of a gateway. It might be the IP address of the RTP relay. There can be several different things, but what it can't be limited to under this language of Claim 20 is something on the packet network, and that's Vonage's only position. It has to be limited to something on the packet network. Claim 20, by its term, says no, the destination address includes the PST and endpoint of the call, the person that you want to talk to. I think that that's actually enough to show why they don't have a substantial question on destination address because it would contradict Claim 20 itself. I'll also note that the specification example of Column 16, Line 35 to 45, is about a call coming into a gateway and then being sent further along. What does Vonage say about that example in its reply? It says, ah, that involves two calls, but I'll call your attention to Line 42 of Column 16. That's part of that little 10-line description. It refers to the call. It's just unnatural to describe the single process from the caller to the endpoint as involving one call to the gateway, a second call from the gateway to somebody else. It's very strange to pick destination address as limited in that way. Well, wouldn't the first destination address and the other example that I gave before be the post office and the second destination address be the PO box number for that particular individual? Well, I think it can depend on context. One of the, maybe a slight variation of this, came up during the trial that Mr. Warren, I think, was talking about.